NOTICE
Decision filed 03/25/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250893-U

NO. 5-25-0893

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* BRANDI C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-JA-91 |
| | ) | |
| Kelly S., | ) | Honorable |
| | ) | Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Hackett and Clarke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The judgment of the circuit court of Champaign County that found the respondent mother unfit and terminated her parental rights was not against the manifest weight of the evidence, and therefore, this court affirms the judgment.

¶ 2   The respondent, Kelly S. (Mother), contends the circuit court of Champaign County erred when it entered a judgment that terminated Mother's parental rights to the minor child, Brandi C. (the minor), who was born in April of 2023. Specifically, Mother contests the circuit court's finding that Mother was unfit. For the reasons that follow, we affirm.

¶ 3   I. BACKGROUND

¶ 4   On August 23, 2023, the State filed a petition for adjudication of wardship (petition), wherein it alleged that the minor was neglected because (1) she was "a newborn infant whose

1

blood, urine, or meconium contained any amount of a controlled substance or a metabolite of a controlled substance, the presence of which was not the result of medical treatment administered to" Mother or to the minor (count I) and (2) the minor's environment was injurious to her welfare when she was allowed to reside with Mother because the minor was exposed "to substance abuse" (count II). Also on August 23, 2023, a shelter care hearing was held,[1] after which the circuit court entered a temporary custody order in which it found there was probable cause to believe the minor was neglected, and in which it noted that Mother appeared at the hearing with counsel and stipulated to temporary custody being placed with the Illinois Department of Children and Family Services (DCFS). The order admonished Mother to cooperate with DCFS.

¶ 5    On October 18, 2023, the circuit court entered an adjudicatory order in which it found the minor was neglected because she was "exposed to illicit drugs." The order stated that Mother appeared in court and "knowingly, understandingly, and voluntarily" admitted and stipulated to count I of the petition. The order summarized the factual basis for its finding as follows: "The minor was born [in April of 2023] and tested positive for cocaine, which was not the result of medical treatment." The order dismissed count II of the petition.

¶ 6    On November 14, 2023, the circuit court entered a dispositional order in which it found the minor to be neglected, made her a ward of the court, and placed her in the custody and care of DCFS. The court found Mother had "a long history of substance abuse and unsuccessful attempts to address it." The court further found Mother was "working on recovery," but needed "time to demonstrate a lasting commitment to that process."

---

[1]The record on appeal does not contain a transcript of this hearing, or of any other hearing prior to the adjudicatory/fitness hearing that began on July 14, 2025.

2

¶ 7     On February 21, 2024, the circuit court entered a permanency order in which it selected a permanency goal of the minor returning home within 12 months, and in which it found Mother had made both reasonable efforts toward the return of the minor, and reasonable and substantial progress toward the return of the minor. The order directed Mother to engage in "visitation, maintain sobriety and maintain communication with the caseworker." Custody and care of the minor was continued with DCFS.

¶ 8     On May 16, 2024, the circuit court entered a permanency order in which it continued the permanency goal of the minor returning home within 12 months, and in which it again found Mother had made both reasonable efforts toward the return of the minor, and reasonable and substantial progress toward the return of the minor. The order again directed Mother to engage in "visitation, maintain sobriety and maintain communication with the caseworker." Custody and care of the minor was continued with DCFS. On August 16, 2024, the circuit court entered a permanency order that was substantially similar to the previous two orders, again finding Mother had made both reasonable efforts toward the return of the minor, and reasonable and substantial progress toward the return of the minor.

¶ 9     On November 15, 2024, the circuit court entered a permanency order in which it continued the permanency goal of the minor returning home within 12 months. However, the order declined to make findings regarding Mother's efforts or progress "due to filing of motion." The motion in question was the State's motion seeking a finding of unfitness and termination of Mother's parental rights to the minor (motion), which was file stamped November 14, 2024, but which appears in the record on appeal after the court's November 15, 2024, permanency order. In the motion, the State alleged Mother was unfit because she failed to (1) make reasonable efforts to correct the conditions that were the basis for the removal of the minor during the nine-month period following

3

the adjudication of neglect, which encompassed February 8, 2024, to November 8, 2024, and (2) make reasonable progress toward the return of the minor during the same nine-month period.

¶ 10    A status hearing set for January 16, 2025, was continued to March 5, 2025. A docket entry dated March 5, 2025, stated that "by agreement" the motion was "continued generally," and the cause was set for another permanency hearing on April 17, 2025. On April 17, 2025, the circuit court entered a permanency order in which it continued the permanency goal of the minor returning home within 12 months. The order found Mother had made reasonable efforts toward the return of the minor, but had not made reasonable and substantial progress toward the return of the minor.

¶ 11    An adjudicatory/fitness hearing began on July 14, 2025. A transcript of the hearing is included in the record on appeal. Detective Jim Kerner testified that he was employed by the Urbana police department, and had been for approximately 18 years. He testified that on March 19, 2024, he assisted in the execution of a search warrant at a residence as part of "an investigation into the sale of drugs." Detective Kerner testified that he believed one of the residents of the home was Mother's paramour, who is the natural father of the minor in this case (Father). We note that Father is not a party to this appeal, and we discuss him only as necessary for an understanding of the issues raised by Mother on appeal. Detective Kerner testified that when he spoke with Father, Father reported that he had "been using heroin for numerous years, consume[ed] the substance daily, also use[d] crystal methamphetamine and cocaine occasionally." Detective Kerner testified that Father stated he had "been selling heroin for the past couple of months" and that Father "use[d] the proceeds from selling heroin to pay his bills and to fund his own heroin habit." He testified that the search of the residence led to the discovery of "five lorazepam pills, which is a controlled substance," and to the discovery of "a couple of smoking devices for crack cocaine," but "nothing

else to do with the sale of narcotics." He agreed on cross-examination that no heroin was found, and that tobacco or marijuana also could be smoked using the devices that were found.

¶ 12 Tracy Conroy testified that she was a clinical therapist at the Center for Youth and Family Solutions, and that Mother was one of her clients. She testified that she began counseling Mother in March of 2024 and continued through November of 2024. Conroy testified that the counseling sessions were held in person and on a weekly basis. She testified that "[o]verall," Mother attended the sessions, not missing any in March, then missing one in April and two in May. Conroy testified that she believed two sessions were canceled in June, one by her and the other by Mother. She testified that Mother did not attend any sessions in July. She testified that Mother "missed a couple sessions" during August, September, and October.

¶ 13 Conroy testified that during the sessions Mother attended, Mother engaged with Conroy and was cooperative, and that Conroy did not have any concerns about Mother's "treatment with [Conroy]." Conroy testified that she developed concerns about domestic violence in Mother's relationship with Father. Conroy testified that she learned from Mother "[o]ver time" that there was "psychological, financial, and physical" violence in the relationship. She testified that she believed that Mother was not always forthcoming about her relationship with Father, which she testified was not uncommon for victims of domestic abuse. She testified that she discussed with Mother the possibility of Mother regaining custody of the minor, and that Mother "admitted that she was also concerned for her daughter's safety and she was making a plan to leave and then did leave."

¶ 14 Conroy testified that Mother left Father on November 8, 2024. She testified that Mother told her that Father had lied to Mother about drug activity going on in the home they shared, but that Mother did not learn of the lie until "[m]onths later," when Mother was attending a court

5

hearing. Conroy testified that during the months she counseled Mother, "[t]here would be occasions if [Mother] was struggling with something she would reach out to" Conroy between their regular sessions. She testified that she discussed with Mother options that DCFS could provide for "housing, employment assistance, things like that."

¶ 15    On cross-examination, Conroy testified that Mother lived with Father from February 8, 2024, to November 8, 2024, the time period in question. She testified that she was concerned about Mother's sobriety during that time. Conroy testified that Mother told her that Father forced Mother to lie to police about someone else who was staying in the home, that Mother "was not allowed to answer the door while she lived" in the home, and that Father forced Mother to give him money she earned from her job. Conroy testified that she informed Mother that she believed living with Father "would hurt her ability to have her daughter return home," and also jeopardized Mother's safety. She testified that Mother acknowledged that if returned, the minor "would be in harm's way." She testified that "multiple times across multiple sessions" she encouraged Mother to leave Father, and that Mother seemed to understand Conroy's concerns. Conroy testified that she told Mother that she could not recommend that the circuit court return the minor to Mother's custody while Mother was living with Father because she did not believe that was safe.

¶ 16    Conroy agreed that victims of domestic violence often take a long time to leave their partners, if they leave them at all, and that it is not uncommon "for a victim of domestic violence to take several months to even comprehend that they are in a violent relationship." Conroy testified that Mother had "made significant progress" in her mental health during the course of their sessions, leading up to November 8, 2024. She testified that Mother had built her confidence, and that beginning "[a]round October" of 2024, Conroy began to see signs that Mother was going to leave Father, which Mother did on November 8, 2024.

6

¶ 17    Ashler Uebele testified that she was a child welfare specialist with DCFS. She testified that she became Mother's caseworker in October of 2023 and remained so as of the date of the hearing. Uebele testified that Mother and Father lived together in two different homes from February 8, 2024, to November 8, 2024. She testified that on two occasions, Mother denied Uebele access to the first of the homes to conduct a safety check, once "as a result of still being in boxes," and the second time because "of the carpeting being in an unseemly state." When Mother and Father moved to a mobile home in April of 2024, Uebele inspected the home and submitted "an application for housing advocacy" on behalf of Mother and Father, to help them afford a better residence.

¶ 18    Uebele testified that from December of 2023 to October of 2024, Mother had supervised visitation with the minor for two hours twice a week. She testified that in October of 2024, visitation was still supervised but "progressed into the community" for two hours twice a week. She testified that visitation did not take place in Mother's home, and Mother never progressed beyond supervised visits. She testified that the minor was sometimes given gifts at visits, but that she did not know if the gifts came from Mother or Father or both. Uebele testified that Mother was more cooperative than Father with regard to completing the services in her DCFS service plan, and that because Mother and Father lived together during the time in question, Uebele had discussions with Mother about Father's lack of progress "holding her back or *** being imputed onto her." Uebele testified that "around October of 2024," Conroy told Uebele about the domestic violence issues, and that Uebele discussed them with Mother.

¶ 19    Uebele testified that Mother cooperated with "drug drops" following a substance abuse assessment. She testified that Mother was "able to be reached" and stayed in contact with Uebele, and reiterated that Mother participated in visits with the minor. She testified that Mother never

7

progressed beyond supervised visits during the time period of February 8, 2024, to November 8, 2024, because of the "ongoing concerns regarding [Father's] engagement with his services and the ongoing drug concerns with [Father]." She added that it was also because Mother and Father "continued to be a single parental unit through being in a continued romantic relationship," and so DCFS "continued having their visitation be together." She testified that she discussed this with Mother, but she could not remember when that discussion occurred.

¶ 20    Uebele testified that during a meeting in August of 2024 about a pending possible eviction of Mother and Father, "we started a discussion about the fact that they were linked as a single parental unit and that *** [Father's] lack of engagement in his services meant that there was potential that they could have their parental rights terminated together without a separation in the relationship." She testified that in addition to Mother's visitation with the minor, "[t]here was quite a bit of friendly communication between [Mother] and the foster parents that [took place] through the form of a notebook and sometime cards and gifts in a backpack that went—stayed with [the minor] to and from her day-care." When asked if there was ever a time that DCFS was "close" to returning the minor to Mother's care, Uebele testified, "No." When asked why not, she answered, "Due to the ongoing concerns with the lack of engagement in services and the ongoing drug usage by [Father] and the fact that they continued to be in a romantic relationship, they were considered a single parental unit."

¶ 21    On cross-examination, Uebele testified that her concerns about the first residence she inspected, where Mother and Father lived until they moved to the mobile home, included a "strong smell of tobacco residue as a result of multiple years of smoking cigarettes within the home *** as well as clutter and overall upkeep of the home." She testified that the minor could not have been returned to that residence. She testified that her concerns about the mobile home again included "a

8

strong smell as a result of consistent tobacco smoking within the home *** as well as some issues of clutter and residue." She testified that based on the possible eviction she learned about in August of 2024, she had concerns about Mother and Father having stable housing for the return of the minor.

¶ 22    Uebele testified that prior to November 8, 2024, she had multiple conversations with Mother, informing Mother of the possible consequences if Mother did not separate from Father. She testified that she and Mother discussed "a plan" for Mother to leave Father, and that Uebele told Mother about agencies that could provide support for her. She testified that Mother still lived with Father "by November 8, 2024," and that as of that date, Mother and Father did not "have safe and stable housing for [the minor] to return home." She testified that the fact that Mother and Father still lived "together as of November 8, 2024," impeded Mother's "progress towards herself achieving the return home goal."

¶ 23    When cross-examined by Mother's counsel, Uebele agreed that although Mother missed a drug drop on August 30, 2024, Mother had completed three negative drug drops prior to that, and then completed seven negative drug drops after that. She thereafter agreed that Mother "never had a positive drop the entire relevant time period." She clarified that her ongoing concerns about drug use in the home related only to Father, not to Mother. She agreed that as of November 8, 2024, Mother "was essentially geared up to be successfully discharged from substance abuse [treatment]," had completed her parenting education requirements, was completing random drug drops, and showed "[n]o outward signs of use, no erratic behavior." She further agreed that Mother had been in counseling continuously since March of 2024, never missed visits with the minor, and had positive interactions with the minor during visits. Uebele agreed that visits could have taken place in Mother's home if that "home had been appropriate and there were no other parties within

9

the home that [DCFS] had concerns about." Following Uebele's testimony, the State rested. The hearing was recessed after being scheduled to resume on August 25, 2025.

¶ 24    When the hearing resumed on August 25, 2025, the remaining parties declined to present evidence, and the case proceeded to arguments. Mother's counsel argued that she agreed that Father was unfit, but that his unfitness should not be imputed to Mother, because the circuit court was required to "make individualized determinations." Counsel also argued that Mother left Father on November 8, 2024, the final day of the reporting period in question, which showed "substantial progress" toward the return of the minor. Counsel added that she believed Mother's "acknowledgement of the underlying violence that was in her relationship that she just was not aware of until she processed it with Ms. Conroy shows drastic understanding of the issues and shows drastic responsibility assumption, all of which is progress in this case." She argued that even if Mother was not "close" to regaining custody of the minor on November 8, 2024, Mother did leave Father that day, and therefore Mother regaining custody of the minor "could have been a possibility shortly thereafter."

¶ 25    At the conclusion of the arguments, the circuit court stated that it found that "[t]his case came into existence because [the minor] *** tested positive for cocaine at the time of her birth," which meant that "there were issues right from the start in terms of substance abuse issues by [Mother and Father], their relationship with each other and everything that that entailed." The court found Mother made reasonable efforts toward the return of the minor, but did not make reasonable progress during the nine-month time frame. The court noted that Mother's efforts were all made "in the context of continuing to live with someone who was still using drugs *** somebody who clearly wasn't providing financial stability, somebody who wasn't being a supportive co-parent in terms of visits with" the minor.

10

¶ 26    The court found that with regard to reasonable progress, "that's not a subjective standard. It's an objective standard." The court noted that Mother's counsel "correctly pointed out that the court should make individualized findings. So, it's not a matter of because one parent is unfit, therefore the other parent is unfit." The court stated that it was required to look at the nine-month period alleged in the motion, which was February 8, 2024, to November 8, 2024, and that the court could not "take into account *** a few months after that." The court stated that "certainly in the early parts of that nine-month period," Mother's "attendance at counseling was very sporadic." The court posited that if Mother "had been much more engaged and consistent in counseling right from the start, maybe she would have been able to come to some realizations about domestic violence and [Father] sooner than what she did, maybe much earlier in the nine-month period." The court added that "[m]aybe she would have moved out, separated from him much earlier, realized that she couldn't ever be in a spot to co-parent with him, at least based on the lack of efforts and progress he was making." The court noted that it did not know if that would have made a difference, but added that "despite some of the realizations she was making" in counseling, Mother did not move out until November 8, 2024.

¶ 27    The circuit court stated that because of that, Mother "was never in a residence in that 9-month period where [DCFS] felt like it would be safe for [the minor] to even have visits at the residence *** let alone to return [the minor] to her care." The court added that, "as a result, [Mother] was in a position where visits could never even progress beyond supervised visits, again, during that nine-month period." The court reiterated that "it's absolutely true that just because one parent is found unfit, doesn't mean that the other parent is found unfit." The court also reiterated, however, that the fact that Mother chose to stay with Father and did not move out until the last day of the nine-month period "directly relates to the progress that can be made or an impediment to

11

that progress that can be made." The court thereafter found Mother unfit for failure to make reasonable progress toward the return home of the child.

¶ 28 On October 29, 2025, a best interest hearing was held. Because Mother does not challenge the best interest findings, we do not describe the hearing in detail. We note, however, that testimony adduced at the hearing indicated that the minor had special needs that were "both developmental and medical," and that those needs were being met in the minor's foster home setting. We note as well that testimony was adduced about contact, in March or April of 2025, between Mother and Father after Mother left Father on November 8, 2024. After hearing testimony and argument, the circuit court stated that it had considered the requisite statutory factors, which the court discussed in extensive detail in relation to Mother and in relation to the minor's foster family. In response to argument from the parties, the court stated that it did "not believe that if [Mother's] parental rights were not terminated today that a return home for [the minor] to [Mother] would be imminent." The court added that it believed some of Mother's behaviors were still "problematic," including the fact that she did not disclose the contact she had with Father after November 8, 2024, until "after the fact," and the fact that in a recent psychological examination in preparation for the hearing, Mother continued to "minimiz[e] how this case came into existence; minimiz[e] what, why the case is still at this point, or how it got to this point ***; minimiz[e] past legal issues; [and] minimiz[e] past drug use."

¶ 29 The circuit court related these observations to the best interest factor of permanence, and added that the court did not "believe that [Mother] would be in a position to provide permanence for [the minor] at any point that could be considered imminent by any *** definition." The court added that Mother's present situation was "such a huge contrast with what the foster parents are able to provide, what they have provided, what they've expressed that they're willing to provide."

12

Thereafter, the circuit court found that the State had proven, by a preponderance of the evidence, that it was in the minor's best interests for Mother's parental rights to be terminated. This timely appeal followed.

¶ 30                                    II. ANALYSIS

¶ 31    Parents have a fundamental liberty interest in the care, custody, and management of their children. See, *e.g.*, *In re D.T.*, 212 Ill. 2d 347, 363 (2004). The involuntary termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. The State must first prove by clear and convincing evidence that the parent is unfit under any of the discrete and independent grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re M.I.*, 2016 IL 120232, ¶ 20; *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("the grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness."). Although the State may rely on several grounds in its motion to terminate parental rights, a finding adverse to the parent on any single ground is sufficient to support a subsequent termination of parental rights. *In re C.W.*, 199 Ill. 2d at 217. In other words, "only one ground of [parental] unfitness need be proved to find a parent unfit." *In re J.P.*, 261 Ill. App. 3d 165, 174 (1994).

¶ 32    If the circuit court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor children to terminate parental rights. *In re D.T.*, 212 Ill. 2d at 352, 366. At this stage of the proceedings, the court's focus necessarily shifts to the best interests of the children and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life" (*In re D.T.*, 212 Ill. 2d at 364), because a prompt, just, and final resolution of a child's status,

13

as opposed to having that status remain in limbo, is in the child's interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 33 On appeal, this court accords great deference to the circuit court's decisions in termination proceedings because the circuit court is in a better position to observe witnesses and to judge their credibility. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. This court does not reweigh the evidence or reassess the credibility of witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Unless the circuit court's findings of parental unfitness or the child's best interest are against the manifest weight of the evidence, this court will not disturb the circuit court's findings. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 34 In this case, one of the alleged statutory grounds of unfitness was Mother's failure to make "reasonable progress" toward the return of the child during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress" is judged by an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). The "benchmark" for measuring reasonable progress includes "compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). A parent has made reasonable progress when the circuit court, "in the *near future*,

will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 35    As explained above, the circuit court in this case found that Mother was unfit due to her failure to make reasonable progress toward the return of the minor during the nine-month time period of February 8, 2024, to November 8, 2024. On appeal, Mother contends the circuit court's finding that she was unfit was against the manifest weight of the evidence. Specifically, Mother contends the circuit court erred because she "undeniably made reasonable progress toward reunification" during the nine-month period. She argues that "[s]he progressed from captivity in a domestically violent relationship, through awakening to its existence and significance for both her and [the minor], to escape from it, all while maintaining a regular and positive relationship with her daughter, completion or near-completion of services, maintenance of sobriety, and consistent and cooperative relationships with both counselor and caseworker." Mother notes some of the evidence, and the circuit court's observations regarding it, and posits that the circuit court's analysis indicates "the application of a subjective standard for the measurement of progress: whether or not a parent might have made more or faster progress had she only done this or that differently" rather than the required objective standard. She argues that when an objective standard is employed, she "clearly made" measurable or demonstrable movement toward reunification with the minor.

¶ 36    We do not agree that the circuit court's finding that Mother was unfit was in error. As the State aptly notes, Mother was required by her service plans, among other things, to obtain and keep appropriate housing for the minor, which Mother did not do during the nine-month period. Indeed, Uebele testified that Mother still lived with Father "by November 8, 2024," and that as of that date, Mother and Father did not "have safe and stable housing for [the minor] to return home." The

15

circuit court made a specific finding that because Mother did not move out of the residence she shared with Father until the last day of the time period in question, Mother "was never in a residence in that nine-month period where [DCFS] felt like it would be safe for [the minor] to even have visits at the residence *** let alone to return [the minor] to her care."

¶ 37    Uebele also testified that Mother never progressed beyond supervised visits during the time period of February 8, 2024, to November 8, 2024, because of the "ongoing concerns regarding [Father's] engagement with his services and the ongoing drug concerns with [Father]." The circuit court also made a specific finding about this issue, noting that because Mother remained in a live-in relationship with Father, Mother "was in a position where visits could never even progress beyond supervised visits, again, during that nine-month period." The court reiterated that "it's absolutely true that just because one parent is found unfit, doesn't mean that the other parent is found unfit," but also reiterated that the fact that Mother chose to continue to live with Father and did not move out until the last day of the nine-month period "directly relates to the progress that can be made or an impediment to that progress that can be made."

¶ 38    We also do not agree that the circuit court utilized a subjective standard when evaluating Mother's progress. First, the circuit court specifically stated that the proper standard was an objective one, which was correct, and we presume that the circuit court not only knows the law, but also that it follows the law, unless the record indicates otherwise. See, *e.g.*, *In re Alexander R.*, 377 Ill. App. 3d 553, 556 (2007) (appellate court presumes circuit court knows and follows the law unless the record indicates otherwise). Second, the circuit court specifically stated that it did not know if things would have been different if Mother had left Father sooner, only that possibly they could have been. This statement was not inappropriate, particularly when it came, as it did in

16

this case, moments after the circuit court stated that it was required to look at the nine-month period alleged in the motion, and could not "take into account *** a few months after that."

¶ 39    We note as well that at the outset of its ruling, the circuit court stated that it found that "[t]his case came into existence because [the minor] *** tested positive for cocaine at the time of her birth," which meant that "there were issues right from the start in terms of substance abuse issues by [Mother and Father], their relationship with each other and everything that that entailed." This was an accurate statement, and provided the context for the court's findings and rulings that followed, because as long as Mother continued to live with Father—and as long as Father continued his drug use and his inactivity with regard to his own service plans—there would be tremendous obstacles to the return of the minor. Taken as a whole, the foregoing evidence demonstrates that despite Mother leaving Father on the final day of the nine-month period, "in the near future" the circuit court would not be able to order the minor returned to Mother's custody, and thus Mother failed to make reasonable progress. See *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). In reaching this conclusion, we reiterate that the circuit court was in the best position to judge the credibility of the witnesses (see *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53), and that we will not reweigh the evidence or reassess the credibility of those witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). The opposite conclusion to that reached by the circuit court in this case is not clearly apparent, and the circuit court's determination is not unreasonable, arbitrary, or not based on the evidence presented; accordingly, the circuit court's finding is not against the manifest weight of the evidence (see *In re D.F.*, 201 Ill. 2d 476, 498 (2002)), and we will not disturb it. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). Because Mother does not challenge the best interest findings in this case, we affirm those findings of the circuit court as well. See Ill. S. Ct. R. 341(h)(7) (eff.

17

Oct. 1, 2020) (points not argued in appellant's opening brief are forfeited and may not be raised in reply brief, oral argument, or on petition for rehearing).

¶ 40                                III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Champaign County.


¶ 42    Affirmed.